**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ROBERT BURDA ) | Case No.: 2:08 CV 246 |
| 6114 Quin Abbey Court ) | |
| Dublin, OH 43017 ) | Judge Smith |
| ) | Magistrate Judge Abel |
| XCL ENTERPRISES, LLC ) | |
| 6114 Quin Abbey Court ) | **FIRST AMENDED COMPLAINT WITH** |
| Dublin, OH 43017 ) | **JURY DEMAND** |
| ) | |
| BURDA ENTERPRISES, LLC ) | |
| 6114 Quin Abbey Court ) | |
| Dublin, OH 43017 ) | |
| ) | |
| SONDOCATT INVESTMENTS, LLC ) | |
| 6114 Quin Abbey Court ) | |
| Dublin, OH 43017 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| V. ) | |
| ) | |
| WENDY'S INTERNATIONAL, INC. ) | |
| 4288 West Dublin Granville Road ) | |
| Dublin, Ohio 43017 ) | |
| Serve Upon: ) | |
| Statutory Agent Corp ) | |
| 52 E Gay Street ) | |
| Columbus, Ohio 43215 ) | |
| ) | |
| WENDY'S OLD FASHIONED ) | |
| HAMBURGERS OF NEW YORK, INC. ) | |
| 4288 West Dublin Granville Road ) | |
| Dublin, Ohio 43017 ) | |
| Serve Upon: ) | |
| Statutory Agent Corp ) | |
| 52 E Gay Street ) | |
| Columbus, Ohio 43215 ) | |
| ) | |
| THE NEW BAKERY CO. OF OHIO, INC. ) | |
| 750 Airport Road ) | |

Zanesville, Ohio 43701        )
     Serve Upon:          )
     Statutory Agent Corp    )
     52 E Gay Street        )
     Columbus, Ohio 43215   )
                              )
         Defendants.       )
                              )
                              )

## INTRODUCTION

1.     Plaintiff Robert Burda ("Burda") was a franchisee of Wendy's International, Inc., with a total of thirteen stores in Massachusetts. Wendy's forced him to open seven of those stores pursuant to its Franchise Real Estate Development Program ("FRED program"), which it introduced in 2000. Burda's market was not large enough to absorb these additional stores, with the result that the FRED program stores cannibalized the sales from Burda's existing six stores. When the disastrous economic consequences of the FRED program became clear, Wendy's sought to cut its losses by breaching the covenant of good faith and fair dealing implied in its franchise agreements, thereby forcing Burda out of business. Once it had terminated the Burda's rights as a franchisee, Wendy's reopened his profitable stores and disposed of the remaining properties. As a result of Wendy's conduct, Burda's losses exceed $5 million.

## PARTIES

2.     Plaintiff Robert Burda is an Ohio resident. He entered into thirteen separate Unit Franchise Agreements, as franchisee, with Defendant Wendy's International, Inc. ("Wendy's").

3.      Plaintiff XCL Enterprises, LLC is a Massachusetts limited liability company and a joint franchisee with Burda and Burda Enterprises, LLC on certain Unit Franchise Agreements they entered into with Wendy's.

4.      Plaintiff Burda Enterprises, LLC is a Delaware limited liability company and a joint franchisee, with Burda and XCL Enterprises, LLC on certain Unit Franchise Agreements they entered into with Wendy's.

5.      Plaintiff Sondocatt Investments, LLC is a Massachusetts limited liability company and was the owner and operator of certain Wendy's Old Fashioned Hamburgers Restaurants with Burda.

6.      Defendant Wendy's International, Inc. ("Wendy's") is an Ohio corporation, with offices located at 4288 West Dublin Granville Road, Dublin, Ohio 43017. Wendy's was the franchisor on all of the Unit Franchise Agreements executed by Burda.

7.      Defendant Wendy's Old Fashioned Hamburgers of New York, Inc. is an Ohio corporation, with offices located at 4288 West Dublin Granville Road, Dublin, Ohio 43017, and is the assignor on certain ground leases on which one or more of the plaintiffs was the assignee.

8.      Defendant The New Bakery Co. of Ohio, Inc., is an Ohio corporation with its principal place of business at 750 Airport Road, Zanesville, Ohio 43701.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the plaintiffs have asserted an antitrust claim under 15 U.S.C. § 1.

10. Venue is appropriate in the Federal District Court for the Eastern Division of the Southern District of Ohio because Defendant Wendy's International, Inc. maintains its principal place of business in this District.

**FACTS**

11. Burda purchased five Wendy's stores in November 1996, These stores are identified by Wendy's as stores 101, 102, 103, 104, and 105 ("the non-FRED stores"). Hereinafter, Burda shall be used to refer to Plaintiff Burda as well as each of his wholly-owned subsidiaries, e.g., Plaintiffs Sondocatt Investments, LLC, XCL Enterprises, LLC, and Burda Enterprises, LLC.

12. In 1998, Deloitte & Touche LLP prepared a gross valuation of the non-FRED stores of $9,040,000, with just under $6 million of debt, or over $3 million net. In 1999 or early 2000, a third-party provided a second valuation, which valued the same stores at $4 million net.

13. Wendy's introduced its Franchise Real Estate Development Program ("the FRED program") in 2000. Under the FRED program, Wendy's designated certain markets as FRED markets. Once a market was designated as a FRED market, Wendy's would acquire property for new store locations, and build stores on those sites. The local franchisee was then given the opportunity to open the store. If the franchisee rejected that opportunity, Wendy's would open the store as a corporate store, or offer the store to a neighboring franchisee.

14. Burda's market was designated as a FRED market, and Wendy's advised him that it planned to open two new stores in his market in 2000. In August 2000, Burda met with Wendy's chief financial officer, Tom Mueller. Burda had learned that Wendy's

planned to open two to three new stores for the next several years in his market. Burda told Mueller that he could not finance such rapid growth. Mueller told Burda that Wendy's was the franchisor, and that Burda was the franchisee, and that if Burda did not do what Wendy's wanted, Wendy's would put him out of business within five years.

15.     To meet Wendy's demands for rapid growth, Burda began opening stores under the FRED program: he opened stores 107 and 108 in December 2000; he opened store 109 in August 2001; he opened store 110 in November 2001; he opened store 111 in September 2002; he opened store 112 in December 2002; he opened store 113 in December 2003; he opened store 106 in December 2007.  Stores 106 through 113 are collectively referred to herein as "the FRED stores."

16.     Burda opened the FRED stores because he believed that if he did not open them, Wendy's would seek to end his relationship with it as a franchisee. This belief was based, in part, on his conversation with Tom Mueller in August 2000.

17.     The FRED program foisted on Burda by Wendy's resulted in over-penetration of a stagnant market and the cannibalization of sales at his non-FRED stores, a drop in per-store sales, a dramatic drop in Burda's earnings before interest, taxes, depreciation and amortization ("EBITDA"), and a severe drop in the value of Burda's investment in his Wendy's stores. For the period 2000-2007, Burda's total lost EBITDA as a result of the FRED program was approximately $4 million.

18.     On March 14, 2006, Burda met with Jack Schussler, Wendy's president, CEO, and COO. Burda expressed concerns over the financial strains that the FRED program had placed on his company. Burda requested that Wendy's allow him to close

stores 110, 111, and 112. Schussler refused, and instead suggested that Burda meet with Kris Kaffenbarger, the vice-president for franchise finance.

19.     On March 16, 2006, Burda met with Kaffenbarger and other Wendy's executives. At that meeting, Burda was urged to fire his district manager, Ron Cole, and his operator, Chris Gouzounis.

20.     On April 25, 2006, Wendy's executives Rick Hawes and Ed Rafter made an unannounced tour of Burda's Wendy's stores. Wendy's labeled this a "capital expenditures" tour. But the real purpose of this visit was for Wendy's to begin fabricating a basis for terminating Burda's franchise agreement.

21.     On July 26, 2006, Burda met with Wendy's executive Ed Rafter, who told him that he needed to immediately replace his operator, Chris Gouzounis, if he expected to remain as part of the Wendy's system.

22.     On October 17, 2006, Wendy's quality assurance team evaluated all of Burda's stores. The quality assurance team identified 1,577 deficiencies in Burda's thirteen stores. Rafter told Burda that the problem was his operator, Chris Gouzounis, and that Burda needed to fire him. On October 22, 2006, at Wendy's insistence, Burda fired Gouzounis.

23.     On October 24, 2006, Burda met with Dave Whitaker, Wendy's Regional Franchise Area Director. Whitaker expressed shock and dismay that Burda had fired Gouzounis.

24.     At a November 13, 2006 meeting with Wendy's executives Ed Rafter and Tom Spero, Burda asked Rafter to recommend a replacement for Gouzounis, whom Burda had fired at Rafter's behest.  Rafter offered no help.

25.    In November 2006, Wendy's complained to Burda about the managers of stores 107 and 113. They urged him to fire the manager of store 113. Both managers were later retained or rehired by Wendy's after Burda's franchise agreement was terminated.

26.    On December 13, 2006, Wendy's quality assurance team conducted an interim assessment. Burda had already corrected 1,142 of the 1,577 deficiencies previously identified by the quality assurance team.

27.    On April 23, 2007, another quality assurance audit was conducted. They were critical of Burda's inability to eliminate drain flies. The problem had previously been addressed by a Wendy's approved pest control company. When that pest control company had failed to resolve the issue, Burda had hired a new pest control company, which was also approved by Wendy's. Not satisfied with the performance of the Wendy's-approved pest control companies, in July 2007, Burda contacted the local Orkin franchise. Orkin advised Burda to pour bleach down the drains. But Wendy's would not permit this. Orkin also advsied Burda that his situation was not unique and that nearly every fast-food restaurant in western Massachusetts was suffering from a drain fly problem.

28.    On June 13, 2007, Burda met with Kaffenbarger and other Wendy's executives. They criticized the results of the quality assurance audits. At the end of the meeting, Kaffenbarger walked Burda to the door, and told him that it was not a question of whether he would be pushed out of the Wendy's system, but when. He urged Burda to think about how he would spend the rest of his life without Wendy's.

29.  On June 18, 2007, Wendy's conducted another quality assurance inspection of Burda's stores.

30.  On June 19, 2007, Kaffenbarger advised Burda that Wendy's was willing to consider purchasing Burda's stores, and that it was preparing a valuation.

31.  On June 26, 2007, Burda met with Dave Near, the president of Wendy's North America. In spite of the fact that Burda had been told to fire his previous operator, and Wendy's had never suggested or otherwise helped with a replacement, Near told Burda that he was concerned that Burda did not have an approved operator. Near also told Burda that he didn't believe he was committed to Wendy's because Burda had not moved to Massachusetts. Finally, he told Burda that he would not be part of the Wendy's system much longer.

32.  On July 3, 2007, Capmark Financial Group filed a lawsuit against Burda for defaulting on mortgages on stores 101, 102, 103, 104, and 105.

33.  On July 12, 2007, Burda reached an agreement with Capmark that it would not pursue the mortgage default if Jim Taggart, a Wendy's-approved restructuring officer, was given operational control over stores 101, 102, 103, 104, 105, and 106.

34.  On July 16, 2007, Burda entered into a letter agreement with Wendy's stating that Wendy's would not pursue default remedies against Burda if he actively pursued a sale of his stores. Burda immediately began negotiating with Wendy's to sell his stores to Wendy's.

35.  On July 20, 2007, Burda met with Kaffenbarger. At that meeting, Kaffenbarger gave Burda a notice of termination of franchise agreements, and gave him 120 minutes to close all 13 of his stores and terminate more than 400 employees.

36.    Although Wendy's had closed all of Burda's stores on July 20, as of July 24, 2007, Burda was still in negotiations with Wendy's for the sale of his stores.

37.    On August 2, 2007, Wendy's served Burda with a notice of termination of assignment and assumption of ground leases for stores 107, 109, 111, and 113.

38.    Since August 2007, Wendy's has sold or re-opened certain of Burda's stores.

39.    Wendy's engaged in a concerted campaign to eliminate Burda as a franchisee.

40.    Rick Hawes, a Wendy's executive, disclosed to one of Burda's employees that Burda's failure as a franchisee was preordained by Wendy's, and that Hawes was on standby as early as March 2007 to takeover the operation of Burda's restaurants if his franchise agreements were terminated.

41.    Prior to terminating its relationship with Burda, Wendy's had extensive complaints regarding store 102. According to Wendy's the store was old, in need of significant repair, and infested with sewer flies. Yet, on August 10, 2007, store 102 received an "Every Customer Counts" award, and was cited as on of the "best of the best" in the Wendy's system. The management of store 102 was congratulated for its attention to the highest standards of cleanliness and food safety. This award for store 102 demonstrates that Wendy's complaints about Burda's operations were pretextual.

**COUNT ONE**
**BREACH OF CONTRACT–INADEQUATE NOTICE OF TERMINATION UNDER THE UNIT FRANCHISE AGREEMENTS**

42.    The plaintiff repeats and incorporates herein all previously-pleaded averments.

43.      Burda entered into 13 separate Unit Franchise Agreements with Wendy's, one for each Wendy's store that he owned and operated.

44.      The Unit Franchise Agreements do not contain a cross-default clause.

45.      On June 27, 2007, Wendy's sent Burda notices of default with respect to all thirteen of his Wendy's stores. The purported default was a failure to remit payments to Wendy's or The Wendy's National Advertising Program, Inc.

46.      The June 27, 2007 notices of default contained a 30-day cure period. The notices provided that "[i]f the above default is not cured within thirty (30) days, Wendy's has the right and may in its sole discretion cancel and terminate the Franchise Agreements upon the issuance of a notice of termination."

47.      The June 27, 2007 notices of default were the only notices pertaining to all of Burda's stores.  Yet Wendy's terminated all of Burda's Unit Franchise Agreements on July 20, 2007, less than 30 days after sending him the notices of default, which contained a 30-day cure period.

48.      The 30-day cure period contained in the notice of default was consistent with Wendy's standard practice for all of its franchises of offering a 30-day cure period to remedy a default.

49.      Other than the June 27, 2007 notices of default, for which the 30-day cure period had not expired, the termination notice provided to Burda by Wendy's does not provide a basis for terminating all 13 Unit Franchise Agreements.

50.      Wendy's July 20, 2007 Notice of Default and Termination failed to identify specific violations of the Unit Franchise Agreements for each of the thirteen stores owned by Burda. Instead, Wendy's arbitrarily terminated all 13 of Burda's Unit

Franchise Agreements based on violations by some of the stores he owned. By doing so, it breached the terms of the Unit Franchise Agreements.

## COUNT TWO
## BREACH OF CONTRACT–PREMATURE NOTICE OF TERMINATION

51.    The plaintiff repeats and incorporates herein all previously-pleaded averments.

52.    Wendy's breached the Unit Franchise Agreements by terminating them for violations of section 14.2.I., which provides, in part, that Wendy's has the right to terminate the franchisee "if suit to foreclose any lien or mortgage against any material asset comprising part of the Franchised Business or the Restaurant premises or equipment is instituted and not dismissed within thirty (30) days."

53.    Capmark filed a foreclosure suit on July 3, 2007. Under the terms of section 14.2.I., Burda had thirty days to have the suit dismissed. But Wendy's terminated Burda's Unit Franchise Agreements only seventeen days after the suit was filed, well before the thirty-day cure period had expired. Also, Capmark's suit related to only five of Burda's thirteen stores, and did not provide a basis for Wendy's terminating all 13 of Burda's Unit Franchise Agreements.

## COUNT THREE
## BREACH OF CONTRACT–THE DUTY OF GOOD FAITH AND FAIR DEALING

54.    The plaintiff repeats and incorporates herein all previously-pleaded averments.

55.    Every contract in Ohio contains an implied covenant of good faith and fair dealing. This implied covenant requires parties to deal reasonably with each other.

56.    Wendy's breach the implied covenant of good faith and fair dealing by dealing unreasonably with Burda with respect to the FRED stores.

57.    Wendy's required Burda to open the FRED stores, although opening the stores was not in Burda's economic interest.

58.    The FRED stores cannibalized Burda's existing sales and were not profitable.

59.    As early as 2000 and 2001, Burda expressed dissatisfaction with the FRED program and the potential for actual economic stress it created for him as a franchisee.

60.    In March 2006, Burda asked to close stores 110, 111, and 112. Wendy's had discretionary authority to allow Burda to close those stores.

61.    Wendy's responded to Burda's request with increased scrutiny of his stores in search for a pretext for terminating his franchise agreements.

62.    While Wendy's never agreed to allow Burda to close stores 110, 111, and 112, it closed a number of FRED stores in New England that it owned directly. Also, other franchisees in other regions were allowed to close FRED stores.

63.    Wendy's refusal to permit Burda to close stores 110, 111, and 112 was unreasonable and a breach of the implied covenant of good faith and fair dealing.

**COUNT FOUR**
**WENDY'S VIOLATED 15 U.S.C. § 1–NEW BAKERY BUNS**

64.    The plaintiff repeats and incorporates herein all previously-pleaded averments.

65.    Prior to 1997, Burda purchased hamburger buns from LePage Bakery.

66.     In 1997, Wendy's insisted that he change bun suppliers, and that he purchase all of his buns from New Bakery, which was a subsidiary of Wendy's.

67.     Wendy's coerced Burda into buying New Bakery buns. The franchise area director told Burda that he would never be able to expand if he did not purchase his buns from New Bakery. The franchise area director also told him that if he refused to purchase New Bakery buns, he would be picking a fight he could not win. Burda also received phone calls from a senior vice president and the corporate liaison in Columbus, Ohio. They both made veiled threats that if he wanted to remain part of the Wendy's system, he had to purchase New Bakery buns. The ability of Wendy's to punish a franchisee who fails to conform to management demands is demonstrated by the earlier allegations contained in this complaint.

68.     At the time Burda became a Wendy's franchisee, he had no knowledge of a potential obligation to buy his buns from New Bakery. Therefore, he had no means of incorporating the costs of New Bakery buns into his determination of the potential financial return on an investment in a Wendy's franchise.

69.     Burda was locked in as a Wendy's franchisee. Although he owned the real estate on which his stores were located, he was bound by an agreement with Wendy's that the locations could only be used for Wendy's stores. This meant that even if Burda was no longer a Wendy's franchisee, the stores could not be converted to another use. Instead, he would have to sell the properties to a Wendy's approved operator, or to one of Wendy's corporate entities. Because Wendy's had complete discretion over whether it approved or disapproved an operator, it indirectly controlled the demand for any Wendy's locations that Burda might want to sell. Wendy's could set the value on the

properties by refusing to approve a potential purchaser as a Wendy's operator. And, when Wendy's purchased stores for use as corporate stores, it typically did so at a discount of 10% to 20% below market value.

70.     New Bakery became the bun supplier for nearly all of Wendy's stores in the United States, in an area running from Texas to Florida up through New York, and including all of the Midwest.

71.     New Bakery was a highly profitable subsidiary of Wendy's.

72.     Wendy's required that a store's bun freezer be filled every time a delivery of buns was received from New Bakery. A bun freezer could hold as many as 4,000 dozen buns, which, depending on sales, could represent as much as 40 days of supply.

73.     Wendy's general policy was that stores should not maintain more than 2 to 4 days of food supplies. But it made an exception to this policy for the buns sold by its subsidiary, New Bakery.

74.     When stores lost electrical power, the buns would have to be destroyed.

75.     The funds diverted to the purchase of a 40-day supply of buns would have otherwise been used for business operations.

76.     Burda could not have reasonably anticipated that he would be required to purchase New Bakery buns as a Wendy's franchisee.

77.     Wendy's had economic power over its own brand to appreciably restrain competition in the market for buns.

78.     The amount of commerce affected by Wendy's conduct in requiring its franchisees to purchase New Bakery buns is substantial. Wendy's has thousands of stores in the United States.

79.     Burda and other franchisees paid higher prices for buns as a result of this illegal tying arrangement. These higher prices for buns, and the higher costs resulting from having to store buns for up to 40 days, resulted in reduced profits for Burda and other franchises, and higher costs for Wendy's customers, including the customers at Burda's stores.

80.     Wendy's requirement that Burda purchase New Bakery buns after he had become a Wendy's franchisee constituted an illegal tying arrangement, with Burda's Wendy's franchise serving as the tying product, and the New Bakery Buns as the tied product.

81.     Because New Bakery was a subsidiary of Wendy's, Wendy's received a direct economic benefit from the tying arrangement.

82.     The illegal tying arrangement involving New Bakery was a necessary predicate to Burda paying higher prices for buns, Burda having to devote additional space to bun storage, and Burda and Burda having to divert funds from business operations. But for the tying arrangement that required Burda to purchase a 40-day supply of buns from New Bakery, he would have been able to continue to purchase buns from another bakery at lower cost. The increase in bun costs flowed directly from the tying arrangement involving New Bakery.

83.     Wendy's requirement that its franchisees purchase buns from New Bakery had an anticompetitive effect in the market for Wendy's hamburger buns in an area encompassing most of the United States outside of California. The tying arrangement involving New Bakery buns foreclosed other sellers of hamburger buns from selling to Wendy's franchisees.

15

## COUNT FIVE
## WENDY'S VIOLATED 15 U.S.C. § 1–WILLOW RUN FOODS

84.    The plaintiff repeats and incorporates herein all previously-pleaded averments.

85.    At the time Burda purchased his first Wendy's stores, there were multiple Wendy's-approved food suppliers.

86.    In Burda's region, Sygma and Willow Run Foods competed to supply food to Wendy's stores.

87.    Every year, Burda requested the two suppliers to submit competitive bids. This bid process ensured the Burda was able to purchase food at the lowest price.

88.    In 2004, Wendy's granted Willow Run Foods exclusive rights to supply food in Burda's region. Upon information and belief this area included Massachusetts, New York, and Vermont.

89.    At the same time that Wendy's granted these exclusive supply rights, it also guaranteed Willow Run Foods a minimum profit. As part of the minimum profit guarantee, Wendy's imposed a 4-cent-per-case surcharge on any purchases of food supplies that Burda made from any other approved suppliers.

90.    Wendy's coerced Burda into purchasing food supplies from Willow Run Foods by imposing this surcharge on purchases from other food suppliers.  Because of the 4-cent-per-case surcharge, Burda no longer had any choice in food suppliers, nor any ability to negotiate prices for his food supplies.

91.    At the time Burda entered into his franchise agreements, he could not have reasonably anticipated that Willow Run Foods would become the exclusive food supplier for his region. Therefore, he had no means of incorporating the cost of having

Willow Run Foods as his exclusive supplier into his determination of the potential financial return on an investment in a Wendy's franchise.

92. After Wendy's named Willow Run Foods as Burda's exclusive food supplier, his food costs increased from approximately 28% of operating costs to approximately 32%. This reduced his cash flow by $360,000.

93. Wendy's award of exclusive contracts to food suppliers resulted in increased costs for consumers.

94. Upon information and belief, Wendy's has an economic interest in Willow Run Foods, and receives a percentage of the revenues generated by its status as an exclusive supplier of food to Wendy's franchises.

95. Wendy's had economic power over its own brand to appreciably restrain competition in the market for food supplies.

96. The amount of commerce affected by Wendy's conduct in requiring its franchisees in Massachusetts, New York, and Vermont to purchase food supplies from Willow Run Foods is substantial.

97. Wendy's requirement that Burda purchase food supplies from Willow Run Foods after he had become a Wendy's franchisee constituted an illegal tying arrangement, with Burda's Wendy's franchise serving as the tying product, and Willow Run's food supplies as the tied product.

98. The illegal tying arrangement involving Willow Run Foods was a necessary predicate to reducing Burda's cash flow by $360,000. But for the tying arrangement that required Burda to purchase food supplies from Willow Run Foods, he would have been able to continue to receive competitive bids for food supplies, and his

food costs would not have increased from 28% of operating costs to 32% of operating costs. This increase in operating costs flowed directly from the tying arrangement involving Willow Run Foods.

99.     Wendy's requirement that its Massachusetts, New York, and Vermont franchisees purchase food supplies from Willow Run Foods had an anticompetitive effect in the market for supplying food to Wendy's franchisees. The tying arrangement involving Willow Run Foods foreclosed other food suppliers from selling to Wendy's franchisees in Massachusetts, New York, and Vermont.

**WHEREFORE,** the plaintiff respectfully petitions this Court for judgment for such compensatory, monetary, declaratory, injunctive, statutory, civil, punitive, or equitable relief as may be just, proper, or appropriate under the circumstances, including prejudgment interest, treble damages, the expenses incurred by the plaintiff in prosecuting this matter, and the plaintiff's attorney's fees.

**JURY DEMAND**

The Plaintiffs demand a trial by jury on all issues and causes to the fullest extent permitted by law.

> _s/ Dennis E. Murray, Jr._
> Dennis E. Murray, Jr. (0038509)
> James S. Timmerberg (0067499)
> MURRAY & MURRAY CO., L.P.A.
> 111 East Shoreline Drive
> Sandusky, Ohio  44870
> Telephone:   (419) 624-3000
> Facsimile:     (419) 624-0707
> dmj@murrayandmurray.com
> jst@murrayandmurray.com
>
> Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 1, 2008, I caused a true copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of the filing shall be sent using the CM/ECF system to the following:

Michael G. Long (0011079)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Post Office Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-6297
Facsimile: (614) 719-4829
mglong@vorys.com

William A. Sieck (01071813)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Post Office Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-5406
Facsimile: (614) 719-5299
wasieck@vorys.com

Attorneys for Defendants


*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
MURRAY & MURRAY CO., L.P.A.

Counsel for Plaintiffs