# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**Robert Burda,** *et al.***,**

      **Plaintiffs,**

**-V-**                                  **Case No. 2:08-CV- 00246**
                                               **JUDGE SMITH**
                                               **Magistrate Judge Abel**

**Wendy's International, Inc.,** *et al***,**

      **Defendants.**


## OPINION AND ORDER

Plaintiffs Robert Burda, XCL Enterprises, LLC, Burda Enterprises, LLC, and Sondocatt Investments, LLC (collectively "Plaintiffs"), have brought this action against Defendants, Wendy's International Inc., Wendy's Old Fashioned Hamburgers of New York, Inc. and the New Bakery Co. of Ohio, Inc. (collectively "Defendants" or Wendy's), alleging Defendants violated 15 U.S.C. § 1 by forcing the use of New Bakery buns and by requiring Plaintiffs to purchase food supplies from Willow Run Foods. Plaintiffs also assert Ohio common law causes of action for breach of contract. Defendants now move to dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Doc. 23). For the following reasons, the Court **DENIES** Defendants' Motion to Dismiss (Doc. 23).

## I.    BACKGROUND

For purposes of ruling on Plaintiffs' Motion to Dismiss, the Court accepts as true the well-pleaded facts set forth in the Amended Complaint.

Plaintiff Robert Burda ("Burda") is an Ohio resident.  He became a franchisee of Wendy's International in 1996.  Over the course of the relationship between Burda and Wendy's, they entered into thirteen separate Unit Franchise Agreements ("UFA").  Each of the franchise agreements is identical.  Burda alleges he was locked in as Wendy's franchisee because though he owned the real estate on which his stores were located, he was bound by an agreement with Wendy's that the locations could only be used for Wendy's stores.  If he no longer was a Wendy's franchisee, the stores could not be converted to another use.  Instead, Burda would have to sell the properties to a Wendy's approved operator or to one of Wendy's corporate entities.

Prior to 1997, Burda purchased hamburger buns from LePage Bakery.  In 1997, Wendy's insisted that Burda change bun suppliers and that he purchase all of his buns from New Bakery, which was a subsidiary of Wendy's.  New Bakery became the bun supplier for nearly all of Wendy's stores in the United States, in an area running from Texas to Florida up through New York, and including all of the Midwest.  Burda alleges that Defendants coerced him to purchase New Bakery buns under threats that he would loose his franchise if he did not.  Burda further alleges that he had no knowledge of a potential obligation to buy buns from New Bakery, and therefore, he had no means of incorporating the costs of the New Bakery buns into his determination of the potential financial return on an investment in a Wendy's franchise.  Burda states that Wendy's requirement that he purchase buns from New Bakery resulted in reduced profits for his and other franchises.  Burda also claims that Wendy's requirement that its

franchises purchase buns from New Bakery had an anticompetitive effect in the market for

Wendy's hamburger buns in an area encompassing most of the United States outside of

California, foreclosing other sellers of hamburger buns from selling to Wendy's franchises.

Plaintiff Burda makes similar claims with respect to food supply.  The UFA, Section

6.12, provides in relevant part:

> Franchisee shall purchase all food items, ingredients, supplies, materials, and
> other products used or offered for sale at the Restaurant solely from suppliers
> (including manufacturers, distributors, and other sources) who demonstrate, to the
> continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's
> then-current standards and specifications for such items; who possess adequate
> quality controls and capacity to supply Franchisee's needs promptly and reliably;
> and who have been approved in writing by Franchisor prior to any purchases by
> Franchisee from any such supplier, and have not thereafter been disapproved.   If
> Franchisee desires to purchase any products from an unapproved supplier,
> Franchisee shall submit to Franchisor a written request for such approval.
> Franchisee shall not purchase from any supplier until, and unless, such supplier
> has been approved in writing by Franchisor.

When Burda acquired a Wendy's franchise, there were multiple Wendy's-approved food

suppliers.  In Burda's region, Sygma and Willow Run Foods competed to supply food, and each

year, Burda requested that the two suppliers submit competing bids.  In 2004, Wendy's granted

Willow Run Foods exclusive rights to supply food in Burda's region.  Wendy's also guaranteed

Willow Run Foods a minimum profit.  As part of this guarantee, Wendy's imposed a 4-cent-per-

case surcharge on any purchases of food supplies that Burda made from any other approved

suppliers.  Burda alleges that Wendy's has an economic interest in Willow Run Foods, and

receives a percentage of the revenues generated by its status as an exclusive supplier of foods to

Wendy's franchises.  Burda futher alleges that this surcharge made it so he no longer had any

choice in food suppliers or any ability to negotiate prices for his food supplies. Finally, Burda

alleges that he had no knowledge of a potential obligation to buy food supplies from Willow Run

Foods, and therefore, he had no means of incorporating the costs of having Willow Run Foods as his exclusive supplier into his determination of the potential financial return on an investment in a Wendy's franchise. Burda states that after Wendy's named Willow Run Foods as Burda's exclusive supplier, his food costs increased 4%, reducing cash flow by $360,000.

The Amended Complaint was filed on August 1, 2008 (Doc. 22). Plaintiffs assert three state law breach of contract claims (Counts One, Two and Three) and two federal antitrust claims (Counts Four and Five). With respect to the antitrust claims, Plaintiffs claim that they were victims of a tying arrangement, whereby Wendy's used its control over franchise rights to compel Plaintiffs to accept New Bakery hamburger buns and food supplies from Willow Run Foods. On September 2, 2008, Defendants field a Motion to Dismiss (Doc. 23) which seeks dismissal of Plaintiffs' antitrust claims on the grounds of failure to state a claim. Defendants also sought dismissal of the state law claims for lack of subject matter jurisdiction. This motion has been fully briefed and is now ripe for review.

## II.    STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the amended complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods.*, 705 F.2d at 155. The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Consequently, a complaint will be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only if there is no law to support the claims made, or if the facts alleged are insufficient to state a

claim, or if on the face of the complaint there is an insurmountable bar to relief. *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978). Rule 12 (b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 296 (2d ed. 1990). The moving party is entitled to relief only when the complaint fails to meet this liberal standard. *Id.*

Although the court must apply a liberal construction of the complaint in favor of the party opposing the motion to dismiss, a court will not accept conclusions of law or unwarranted inferences of fact cast in the form of factual allegations. *See Blackburn v. Fisk Univ.*, 443 F.2d 121, 124 (6th Cir. 1971); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007)[1]. A plaintiff's obligation to provide the "grounds" of their entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action. *See LULAC v. Bredesen*, 2007 U.S. App. LEXIS 20556 at *3-4 (6th Cir. 2007) (*citing Bell Atlantic Corp. v. Twombly*, 127 S. Ct. at 1964-65). The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief. *Id.*

---

[1] In *Bell Atlantic Corp.*, the United States Supreme Court rejected the language previously used by the Court in *Conley v. Gibson*, providing that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957). *See Bell Atlantic Corp.*, 127 S.Ct. at 1969 (holding that the *Conley* "no set of facts" language "has earned its retirement" and "is best forgotten.").

With respect to antitrust claims, district courts must "be cautious before dismissing an antitrust complaint in advance of discovery," bearing in mind that "proceeding to antitrust discovery can be expensive." *Bell Atlantic Corp.*, 127 S.Ct. at 1966-67.  Specifically, "a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n.17 (1983).

## III.  DISCUSSION

Defendants seek dismissal of Plaintiffs' antitrust claims (Counts Four and Five) and also their state law breach of contract claims (Counts One through Three).

## A.  Plaintiffs' Antitrust Claims (Counts Four and Five)

Defendants argue that Plaintiffs' antitrust claims should be dismissed with prejudice for failure to state a claim upon which relief can be granted because: (1) Plaintiffs have failed to adequately plead a relevant market, that Wendy's International, Inc. has market power over any tying product, or that market power exists under a *Kodak* lock-in theory;[2] (2) Plaintiffs' obligation to purchase buns and food supplies from particular vendors arises from contract rather than any alleged market power of Defendants and thus is insufficient as a matter of law to support an antitrust claim; and (3) the statute of limitations has lapsed.  The Court addresses each of Defendants' arguments in turn.

### 1.  Adequately Pleading Relevant Market

Defendants argue that Plaintiffs have not and cannot adequately plead a relevant market.

---

[2]Though there are other pleading requirements to state a valid § 1 Sherman Act tying claim, this opinion addresses only the contested elements.

6

Specifically, Defendants maintain that Plaintiffs' Amended Complaint is deficient because though it posits relevant markets for the alleged *tied* products—"buns" and "food supplies"—it fails to plead a relevant market or facts suggesting Defendants had market power over a "tying product." (Defs.' Mot. to Dis. at 6-7). Plaintiffs counter that they have satisfied all the pleading requirements of the Federal Rules of Civil Procedure to establish that an illegal tying arrangement existed which violated § 1 of the Sherman Act. Plaintiffs allege that the "tying product" is Burda's Wendy's franchise, and they allege market power in the tying product through a "lock-in" theory of antitrust. For the following reasons, the Court agrees with Plaintiffs that they have sufficiently alleged market power in the tying product through a lock-in theory of antitrust.

> Sherman Act, § 1, provides:
>
> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C.A. § 1.

A "tying arrangement" is "an agreement by a party to sell one product on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 451 (1992). A tying arrangement is only illegal under § 1 of the Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *PSI Repair Servs.,*

*Inc., v. Honeywell, Inc.,* 104 F.3d 811, 815 (6th Cir. 1997) (quoting *Kodak*, 504 U.S. at 462). The market power requirement "is important because, without market power, a seller cannot engage in the forcing necessary to establish a § 1 violation. *Id.* at 818.

The market power requirement generally requires a plaintiff to plead both the relevant *product* market and also to define the relevant *geographic* market. *Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n,* 524 F.3d 726, 733 (6th Cir. 2008); *Ill. Tool Works, Inc. v. Indep. Ink, Inc.,* 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying products."). "The selected geographic market must 'both correspond to the commercial realities of the industry and be economically significant.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962)).

"Market power may exist in a lock-in case, however, where once a customer buys one product, he or she is locked in to buying another product because of the seller's rules." *Michigan Division-Monument Builders of North America*, 524 F.3d at 737 (citing *PSI Repair Servs., Inc.,* 104 F.3d at 817-18). The Supreme Court has held that market power is inferred under a lock-in theory of antitrust "if defendant has monopoly power in an aftermarket product . . . ." *Id.* (citing *Kodak*, 504 U.S. at 477 (1992).

In *Kodak*, Kodak had implemented a policy of selling replacement parts for its photocopiers only to buyers of Kodak equipment who used Kodak's repair services, or repaired their own machines. 504 U.S. at 458. This new policy prevented independent service operators from repairing Kodak copiers. *Id.* The Supreme Court recognized that customers' "heavy initial outlay for Kodak equipment, combined with the required support material that works only with Kodak equipment, [made] switching costs very high for existing Kodak customers." *Id.* at 477.

8

Due to these high switching costs, the Court reversed the trial court's decision granting Kodak's motion for summary judgment on the plaintiffs' § 1 claims, concluding that it was reasonable to infer that Kodak had market power to raise prices and drive out competition in the aftermarket for service and parts for its copiers.

The assertion of an antitrust claim under a *Kodak* lock-in theory "requires specific factual allegations in the complaint that the defendant either changed its rules after the initial sale was made or concealed its rules from its customers." *Michigan Division-Monument Builders of North America*, 524 F.3d at 737 (citation omitted). The Sixth Circuit has explained:

> [T]he change in policy in *Kodak* was the crucial factor in the Court's decision. By changing its policy after its customers were "locked in," Kodak took advantage of the fact that its customers lacked the information to anticipate this change. Therefore, it was Kodak's own actions that increased its customers' information costs. In our view, this was the evil condemned by the Court and the reason for the Court's extensive discussion of information costs.

*PSI Repair Servs., Inc.,* 104 F.3d at 820.

Citing this "change of policy" requirement, Defendants argue that Plaintiffs' efforts to establish market power in the tying product through a Kodak lock-in theory are unavailing. Defendants assert that Plaintiffs' allegations that they "had no knowledge of a potential obligation" to buy buns or food supplies from a specified supplier is disingenuous. (Defs.' Mot. to Dis. at 10 quoting Pls.' Am. Compl.). Defendants contend the possibility of this type of obligation was set forth in the UFA at § 6.12, and consequently, Plaintiffs "knew prior to becoming franchisees that Wendy's might require it to purchase some essential item from a particular vendor." (Defs.' Mot. to Dis. at 11). Plaintiffs dispute that these obligations were contractual, arguing that UFA § 6.12 does not provide a basis for Defendants to require Plaintiffs to purchase supplies from an exclusive supplier. Specifically, Plaintiffs contend that a

9

reasonable franchisee reviewing the UFA at the time the Plaintiffs became a Wendy's franchisee, would not have foreseen that Wendy's would impose exclusive suppliers of these products on its franchisees. Plaintiffs posit that the resolution of this issue is a fact determination that cannot be resolved in the context of a motion to dismiss. The Court agrees with Plaintiffs.

> UFA § 6.12 provides in part:
>
> Franchisee shall purchase all food items, ingredients, supplies, materials, and other products used or offered for sale at the Restaurant solely from suppliers . . . who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. If Franchisee desires to purchase any products from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval. Franchisee shall not purchase from ay supplier until, and unless, such supplier has been approved in writing by Franchisor.

There is no language in this Section that would put a potential franchisee on notice that Defendants would be able eliminate all competition by naming an exclusive supplier or that they could impose a surcharge on approved suppliers. Instead, the language suggests that supplier competition was welcome so long as prospective suppliers met Defendants' "standards and specifications," and "possess[ed] adequate quality controls and capacity to supply Franchisee's needs . . . ." Indeed, Plaintiffs have alleged that the market for the tied products—the buns and food supplies—was competitive prior to the alleged tie. Consequently, the alleged addition of a four-percent surcharge to approved food suppliers or the alleged naming of an exclusive bun supplier, would satisfy the "change of policy" requirement.[3]

---

[3]In a footnote, Defendants posit that Plaintiffs' antitrust theory lacks economic support, claiming that Wendy's would not want to raise prices above a competitive level because the

Accordingly, the Court finds that Plaintiffs have sufficiently plead an antitrust claim

under a *Kodak* lock-in theory and rejects Defendants' first argument in support of dismissing

Plaintiffs' Amended Complaint.

### 2.     Obligation Arises from Contract

Next, Defendants argue "any requirement that plaintiffs purchase buns and food supplies

from approved suppliers was contractual and will not support an antitrust claim." (Defs.' Mot.

to Dis. at 11). Defendants cite *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 433

(3d Cir. 1997), for the following proposition: "[W]here the defendant's 'power' to 'force'

plaintiffs to purchase the alleged tying product stems not from the market, but from the

plaintiffs' contractual agreement to purchase the tying product, no claims will lie." (Defs.' Mot.

to Dis. at 11 (quoting *Queen City Pizza, Inc.*, 124 F.3d at 443)). Based upon this language,

Defendants conclude: "because Plaintiffs do not and cannot show that Wendy's used market

power to coerce them into entering into the UFA, and because Wendy's right to insist that

Plaintiffs purchase certain products arose from contract, and not the assertion of market power,

Plaintiffs' antitrust claims must be dismissed, with prejudice, as a matter of law." (*Id*. at 12).

Defendants' arguments miss the mark. As set forth in the foregoing section, the Court

finds that Plaintiffs have adequately plead market power under a *Kodak* lock-in theory. To reach

this conclusion, the Court found that UFA § 6.12 did not contain language putting a potential

franchisee on notice that Defendants would be able eliminate all competition by naming an

exclusive supplier or that they could impose a surcharge on approved suppliers, especially in

"franchisor/franchisee relationship is one of symbiosis" and "Wendy's needs its franchisees to
be successful." The Court disagrees, and finds that it is plausible that Wendy's chose to gain
immediate profits by exerting market power on locked-in customers such as Burda's Wendy's
Franchises, where switching costs would be too high.

light of the allegations that the market for these supplies was competitive prior to the alleged tie. This finding distinguishes the instant case from *Queen City Pizza, Inc.,* the case relied upon by Defendants.

In *Queen City Pizza, Inc.*, a Domino's franchisee claimed that Domino's "imposed an unlawful tying arrangement by requiring franchisees to buy ingredients and supplies 'as a condition of their continued enjoyment of rights and services under their Standard Franchise Agreement.'" 124 F.3d at 436. Section 12.2 of the Dominos standard franchise agreement provided in relevant part: Dominos's Pizza Inc. "may in our sole discretion require that ingredients, supplies and materials used in the preparation, packaging, and delivery of pizza be purchased ***exclusively*** from us or from approved suppliers or distributors. *See id*. at 433. (emphasis added). Further, under the standard franchise agreement, Domino's was the exclusive seller of approximately 90% of the ingredients and supplies used by Domino's franchisees. *Id.* at 433-34. Consequently, the *Queen City Pizza, Inc.* court concluded that contractual restraints rather than the market caused plaintiffs to be forced to purchase the ingredients and supplies from Dominos. Notably, the *Queen City Pizza, Inc.* court distinguished the facts of the case before it from those in *Kodak*, pointing out that in contrast to the *Kodak* third-party buyers, the Domino's franchisees knew about the exclusivity purchasing requirements *prior* to becoming "locked-in" by the franchise contract. *Id.* at 440 ("The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies . . . . In contrast, plaintiffs here knew that Domino's Pizza retained significant power over their ability to purchase from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement.").

Unlike the *Domino's* franchisees, Plaintiffs in the instant case are not claiming that

market power was contractually established because UFA § 6.2 required them to purchase buns

and food supplies from exclusive suppliers. Thus, *Queen City Pizza, Inc.* is inapposite and does

not provide grounds for dismissal. Instead, as set forth above, Plaintiffs have asserted a *Kodak*-

type lock-in theory of market power, specifically alleging that at the time Burda entered into his

franchise agreements, he could not have reasonably anticipated being required to purchase buns

and food supplies from exclusive suppliers. (*See* Am. Compl. ¶¶ 76, 91).

Accordingly, the Court rejects Defendants' second argument in support of dismissing

Plaintiffs' Amended Complaint.

### 3. Statute of Limitations

Finally, Defendants argue that Plaintiffs' antitrust claims are barred because the statute of

limitations has lapsed.

A motion to dismiss a complaint per Civ.R. 12(b)(6), which is based upon a failure to

state a claim upon which relief can be granted, should be granted by a trial court when a

complaint on its face indicates that a claim is barred by an applicable statute of limitations. *Mills*

*v. Whitehouse Trucking Co.*, 40 Ohio St.2d 55, 69 (1974); *Goad v. Cuyahoga Cty. Bd. of*

*Commrs.*, 79 Ohio App.3d 521, (1992).

The Clayton Act, 15 U.S.C. § 15b, establishes a four-year limitations period in which to

bring a claim for a violation of the Sherman Act, 15 U.S.C. § 1. The statute of limitations on an

antitrust claim "begins to run when a defendant commits an act that injures a plaintiff's

business." *Zenith Radio Crop. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). "In the

context of a continuing conspiracy to violate the antitrust laws, . . . this has usually been

understood to mean that each time a plaintiff is injured by an act of the defendants, a cause of

13

action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* In the case of a tying arrangement, a plaintiff must "show an 'overt act' pursuant to the original tying arrangement by the [defendants] within the limitation period which caused them an antitrust injury." *National Souvenir Center, Inc. v. Historic Figures, Inc.,* 728 F.2d 503, 509-10 (C.A.D.C. 1984) (citations omitted). This requirement "may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied product market." *Id.* at 510 (citations omitted).

In the instant case, Plaintiffs allege that the claimed tying arrangements lasted until Wendy's terminated the Plaintiffs' franchise agreements in August 2007. Thus, the Complaint, which was filed on March 13, 2008, just 7 months later, falls comfortably within the four-year period of 15 U.S.C. § 15b. Defendants argue that the 2-year limitations period set forth in the UFA rather than the four-year period set forth in 15 U.S.C. § 15b applies. The UFA contains the following language:

> Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Franchisor, brought by Franchisor against Franchisee or Guarantor on the one hand, or by Franchisee or Guarantor against any of the Franchisor Entities on the other hand, shall be commenced within two (2) years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

(UFA at ¶ 26.4). Defendants then conclude that Plaintiffs failed to bring their claims against Wendy's during either the contracted-for two-year statute of limitations or the Clayton Act's four-year statute of limitations. Defendants' conclusion is premised upon Defendants' contention that any alleged violation "occurred when Plaintiffs entered into the UFA in 1996." (Defs.' Mot. to Dis. at 13). The Court disagrees with Defendants' conclusions.

14

Defendants cite *Klein v. State Farm Fire & Cas.*, 250 F.App'x 150, 155 (6th Cir. 2007) for the following proposition: "As long as a contracted-for limitations period is not unreasonable, a contract may lawfully shorten the otherwise applicable statute of limitations period." (Defs.' Mot. to Dis. at 13 n.2).  The *Klein* court's actual holding was limited to contracts for insurance: "A *contract for insurance* may lawfully limit the time within which a suit may be commenced on the contract, even though this period is shorter in duration than that of the applicable statute, as long as the limitations period is not unreasonable." (emphasis added) 250 F.App'x 150, 155 (citing *Hounshell v. American States Ins. Co.*, 67 Ohio St.2d 427, 429 (1981) (same)).  Regardless, even if the Court accepts Defendants' position that Ohio law permits the Clayton Act's four-year limitations period to be contractually shortened, the Court finds that the limitations period set forth in the UFA does not operate to bar Plaintiffs' antitrust claims.

First, the contract language itself limits the scope of the limitations period to "claims and actions arising out of or relating to this Agreement" or those arising out of or relating to "the relationship of Franchisee and Franchisor."  As set forth above, the Court concludes that the UFA did not confer the power on Defendants to take the alleged actions that form the basis for Plaintiffs' antitrust claims.  Therefore, Plaintiffs' claims are not "actions arising out of or relating to this Agreement."  Arguably, however, Plaintiffs' claims relate to "the relationship of the Franchisee and Franchisor."

Even if the Court accepts that the UFA limitations period applies to Plaintiffs' claims, the Court finds UFA at ¶ 26.4 unreasonable, and therefore unenforceable, as it is construed by Defendants.  Defendants cite authority that holds that limitations periods of one-year and six months are reasonable. (*See* Defs.' Mot. to Dis. at 13 n. 2 (citing *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357-59 (6th Cir. 2004); *Klein*, 250App'x at 150; *In re Cotton Yarn Antitrust*,

505 F.3d 274, 293 (4th Cir. 2007). Therefore, Defendants assert that the two-year period set forth

in the UFA is reasonable. This Court does not disagree with this authority or Plaintiffs'

conclusion that two years is reasonable. Instead, the Court takes issue with the reasonableness of

Defendants' conclusions as to when the alleged antitrust causes of actions accrued. Defendants

contend that under the terms of the UFA, the alleged causes of action began to accrue in 1996,

when Plaintiffs entered into UFA (*See* Defs' Mot. to Dis. at 13, 14), or at the very latest, they

began to accrue in 1997, and then again in 2004, when the Complaint alleges Wendy's first

violated the antitrust laws (*See* Defs.' Reply at 8 citing Am. Compl. ¶¶ 66, 88). Defendants cite

the following language from the UFA in support of their interpretation: " . . . shall be

commenced within two (2) years from the occurrence of the facts giving rise to such claim or

action, or such claim or action shall be barred." (UFA at ¶ 26.4).

     For the reasons articulated above, the Court rejects Defendants' assertion that the alleged

antitrust claims accrued when the parties entered into the UFA.[4] Further, to the extent that UFA

¶ 26.4 requires the interpretation Defendants' suggest—that the alleged claims accrued in 1997

and then again in 2004—the Court finds that UFA does not shorten the Clayton Act's limitations

period because the limitations period set forth in UFA ¶ 26.4 is unreasonable. Applying the

Clayton Act's limitation period, Plaintiffs would have until August 2011 to file the alleged

antitrust claims. This is because in the case of tying claims, the four-year limitations period

begins to run when a plaintiff shows an "overt act" pursuant to the original tying arrangement,

---

[4]The Court notes that though it is true that causes of action under antitrust laws that are based upon restrictive provisions in franchise agreements accrue when the agreements were signed (*See Susser v. Carvel Corp.*, 206 F.Supp. 636 (S.D.N.Y. 1962) aff'd 332 F.2d 505), this case law is inapplicable because Plaintiffs' causes af action were *not* based on restrictive provisions in the franchise agreements. *See* discussion *supra* at Section III.A.1-2.

which can be satisfied by maintaining the contractual arrangement which caused the antitrust injury. (*See* discussion *supra*). In the instant case, the "overt act" was the existence of the UFA, which Wendy's did not terminate until August 2007. In contrast, applying the limitations period set forth in UFA ¶ 26.4, as it is construed by Defendants, Plaintiffs' Count Four claim would be time-barred in 1999, two years after Wendy's made New Bakery the exclusive supplier of buns, and Plaintiffs' Count Five claim would be time-barred in 2006, two years after Wendy's made Willow Run Foods the exclusive food supplier. It is not just the disparity in the limitations periods (in this case 12 years for the Count Four claim) that convinces the Court that the limitations period set forth in UFA ¶ 26.4 (as construed by Defendants) is unreasonable—it is also unreasonable because it could result in causes of actions being unfairly time-barred.

For example, suppose a franchisee entered into a franchise agreement in year one. In year two, franchisor changed its rules, naming its subsidiary an exclusive supplier and giving rise to an antitrust claim under a *Kodak* lock-in theory. Franchisee does not bring suit because the exclusive supplier did not raise prices far enough above competitive levels to motivate franchisee to engage in costly litigation. In year five, exclusive supplier raises prices to a level that significantly affects franchisee's profits, and franchisee now desires to sue franchisor. Under UFA ¶ 26.4 (as construed by Defendants), the two-year statute of limitations began to run in year two, when franchisor changed its rules, and thus, franchisee's antitrust claim would be time-barred by year four. In contrast, the four-year limitations period in the Clayton act would not begin to run so long as the franchisee and franchisor maintained their franchise agreement. The Court finds this result unfair and unreasonable.

Accordingly, the Court finds that the limitations period on Plaintiffs' antitrust claims did not begin to run until Wendy's terminated the UFA in 2007. Plaintiffs' Complaint, which was

filed on March 13, 2008, just 7 months later, falls comfortably within either the four-year limitations period of 15 U.S.C. § 15b or the two-year period set forth in UFA ¶ 26.4. Consequently, the Court rejects Defendants' third and final argument in support of dismissing Plaintiffs' Amended Complaint.

**B.** **Plaintiffs' State Law Claims (Counts One through Three)**

Defendants argue that Plaintiffs' state law claims should be dismissed without prejudice for lack of subject matter jurisdiction.  Based upon the Court's foregoing conclusions, the Court has and retains supplemental jurisdiction over Plaintiffs' state law causes of action pursuant to 28 U.S.C. § 1367.

## IV.    DISPOSITION

For all of the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss (Doc. 23).

The Clerk shall remove Document 23 from the Court's pending motions list.

**IT IS SO ORDERED.**

   **/s/ George C. Smith**
   **GEORGE C. SMITH, JUDGE**
   **UNITED STATES DISTRICT COURT**