# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Robert Burda,** *et al.***,**

    **Plaintiffs,**

                  **Case No.: 2:08-cv-246**

**-v-**                 **JUDGE SMITH**

                   **Magistrate Judge Abel**

**Wendy's International, Inc.,** *et al.***,**

    **Defendants.**


## OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment as to the claims of Plaintiffs Robert Burda, XCL Enterprises, LLC, Burda Enterprises, LLC, and Sondocatt Investments, LLC (collectively "Plaintiffs"), against Defendants Wendy's International Inc., Wendy's Old Fashioned Hamburgers of New York, Inc., and the New Bakery Co. of Ohio, Inc. (collectively "Defendants" or "Wendy's"), for breach of contract and antitrust violations (Docs. 61 and 62). These motions are fully briefed and ripe for review. For the following reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment.

## I. Background

Plaintiff Robert Burda ("Plaintiff" or "Burda"), a licensed attorney in Ohio, was the franchisee of thirteen Wendy's restaurants in Western Massachusetts between 1996 and 2007. Burda acquired franchise rights to these restaurants pursuant to thirteen virtually identical Unit Franchise Agreements ("Franchise Agreements") he entered into with Wendy's. Burda formed

three LLCs to operate and own the real and personal property of these restaurants: Sondocatt Investments, LLC, Burda Enterprises, LLC, and XCL Enterprises, LLC (collectively the "LLCs"). This case arises from the financial troubles experienced by Burda in connection with his Wendy's franchises. Plaintiffs' claims against Defendants center on whether Defendants breached the Franchise Agreements or engaged in unlawful conduct as it relates to Burda's Wendy's franchises.

Prior to becoming a Wendy's franchisee, Burda worked at the Wendy's corporate headquarters in the early 1990s on special projects, which included the reorganization of Wendy's operations in Canada and various franchise issues. During his tenure at the Wendy's corporate headquarters, Burda worked closely with the legal department and senior management. In 1996, Burda individually entered into Franchise Agreements for the franchise rights to five Wendy's restaurants (Stores 101-105). In 1997, Burda acquired the rights to an additional Wendy's franchise restaurant (Store 106).

During his first year as a franchisee, Burda purchased sandwich buns for his restaurants from Lepage Bakeries. In 1997, Burda began purchasing buns for the restaurants from Defendant New Bakery, a subsidiary of Wendy's. Burda alleges that this change resulted from the pressure he received from executives at Wendy's to switch his supplier of buns.

In 2000, Wendy's began its Franchise Real Estate Development ("Fred") Program, which was designed to encourage franchisees to buy additional franchises by assisting these franchisees in building the new restaurants. Under the FRED program, Wendy's would identify well-performing markets within the United States that could absorb additional restaurants. Upon designating these markets, Wendy's would offer the new restaurants to existing franchisees in

the markets. If the existing franchisee was unwilling or unable to acquire the additional restaurant, Wendy's would open the restaurant itself or offer the location to other franchisees. Thus, the existing franchisee in the market would either acquire the new location or it would be developed by Wendy's or another franchisee, potentially eroding the existing franchisee's profits.

As it relates here, Wendy's identified locations in Western Massachusetts for development under the FRED program. Burda executed Franchise Agreements for eight restaurants created under the FRED program (Stores 107-113). In August 2004, Burda closed Store 106, and then reopened the store in December 2004 under the FRED program in a different location. As to Stores 107-113, the Franchise Agreements were signed by both Burda and one or more of the LLCs.

It is undisputed that, in connection with his acquisition of the thirteen Wendy's franchises (the restaurants acquired in 1996 and 1997 and then through the FRED program), Burda executed a "General Release of All Claims" against Wendy's and its subsidiaries. Pursuant to these general releases, Burda waived any and all claims, including antitrust and contract claims, that could have been asserted as of the date of the releases.

In July 2004, the LLCs assigned to Burda their rights under the pertinent Franchise Agreements, thereby making Burda, individually, sole franchisee under each of the Franchise Agreements. Burda, individually, and as the managing member of the LLCs, signed a general release in connection with the transfer of the LLCs' franchise rights to Burda.

In 2004, Wendy's required franchisees to purchase food and supplies from Willow Run, a supply distributor (distributes supplies, such as meat, produce, soft drinks, plastic ware, etc., to

3

restaurants), as part of Wendy's attempt to optimize its distribution network.  Wendy's has no

economic interest in Willow Run, and it does not receive anything of value from Willow Run

other than the services it receives for its company-owned restaurants in exchange for payment.

Burda enjoyed financial success during his first eight years as a franchisee.  However, he

started to have trouble when sales began to fall in September 2004.  Additionally, the operator of

his franchises made mistakes creating more problems for Burda.  By early 2006, Burda and his

LLCs were not meeting their obligations under the Franchise Agreements.  In particular, they

were delinquent in paying royalties to Wendy's and fees for Wendy's National Advertising

Program ("WNAP"), as required under the Franchise Agreements.  In May 2006, Burda's

franchises were having "real financial problems," and he was consequently operating the

franchises on "an emergency management basis."  (Burda Jan. 30, 2012 Dep., p. 157).

In March 2006, Burda requested permission to close two or three of the restaurants

opened under the FRED program.  Wendy's declined the request and indicated that if Burda

closed any restaurant, it would terminate all of his franchise rights, effectively resulting in the

closing of all of his restaurants.  In view of the dire financial situation of his franchises, Burda

asked Wendy's for significant financial concessions.  Specifically, Burda requested that he only

be required to make interest only payments on amounts past due for royalties.  Wendy's agreed

to this concession and allowed Burda to defer, for eight months, a payment in excess of

$350,000.  In exchange for this financial concession, Wendy's required Burda to sign an

additional "General Release of All Claims."  On May 24, 2006, Burda signed this release

individually, and as the managing member of the LLCs.  Like the earlier executed releases,

Burda and the LLCs released any and all claims they could have asserted up to the date of the

release against Wendy's and its subsidiaries, including antitrust and contract claims.

In 2007, Burda's Wendy's restaurants continued to have operational issues and the business's capital had been consumed and it was using more cash than what was available. In February, March, April, May, and June 2007, Wendy's sent notices of default to Burda, indicating his repeated failure to meet his financial obligations under the Franchise Agreements pertaining to his thirteen restaurants. In response to this financial crisis, Burda retained the services of a business restructuring expert, James Taggart. Taggart helps businesses emerge from financial distress by assisting these businesses in the renegotiating and restructuring of their debt. According to Taggart, however, Burda's business was "completely insolvent . . . the idea that he could renegotiate and keep going as a viable company given his debts . . . was just unreasonable." (Taggart Dep., p. 22).

On July 20, 2007, Burda met with Wendy's representatives at its corporate headquarters, and Burda was handed a "Notice of Default and Termination of Unit Franchise Agreements" ("Notice of Termination"). The Notice of Termination informed Burda that Wendy's was terminating his Franchise Agreements pursuant to particular sections of the agreements, including the section addressing franchisee default and the section addressing franchisee insolvency, and it identified specific examples of circumstances that necessitated the termination of the agreements, such as repeated defaults under the Franchise Agreements and the failure to timely pay creditors.

In March 2008, Plaintiffs initiated this lawsuit, asserting antitrust and breach of contract claims. In August 2008, Plaintiffs filed an Amended Complaint, which asserted the same claims with additional factual development. These claims are as follows: breach of contract due to

inadequate notice of termination under the Franchise Agreements (Count One); breach of

contract due to premature notice of termination (Count Two); breach of contract due to breach of

duty of good faith and fair dealing (Count Three); violation of 15 U.S.C. § 1 as it relates to New

Bakery buns (Count Four); and violation of 15 U.S.C. § 1 as it relates to Willow Run foods

(Count Five). In September 2008, Wendy's moved to dismiss Plaintiffs' Amended Complaint,

arguing that Plaintiffs failed to state a claim upon which relief can be granted as to the antitrust

claims, and that the state law claims accordingly should be dismissed without prejudice for lack

of subject matter jurisdiction. In September 2009, this Court issued a decision denying Wendy's

motion to dismiss. The Court determined that Plaintiffs had adequately pleaded their antitrust

claims, and that it therefore retained jurisdiction over the state law claims. In October 2009,

Wendy's filed its Answer and Counterclaim, alleging breach of contract and unjust enrichment.

In December 2009, Plaintiffs filed an Answer to the Counterclaim.

On June 6, 2012, Plaintiffs and Defendants filed their respective Motions for Summary

Judgment. Defendants argue that they are entitled to judgment as a matter of law on all claims in

Plaintiffs' Amended Complaint. Conversely, Plaintiffs argue that they are entitled to judgment

as a matter of law on all three of their breach of contract claims and the antitrust claim

concerning New Bakery buns. These cross-motions are briefed and ripe for disposition.[1]

II.    **Summary Judgment Standard**

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of

Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant

---

[1] No party has filed any dispositive motion in regard to Defendants' breach of contract
and unjust enrichment counterclaims.

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate,

however, if the nonmoving party fails to make a showing sufficient to establish the existence of

an element essential to that party's case and on which that party will bear the burden of proof at

trial.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir.

2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric*

*Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence

and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving

party.  *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-53.  Moreover,

the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine

issues of fact to be tried.  *Lashlee v. Sumner*,  570 F.2d 107, 111 (6th Cir. 1978).  The Court's

duty is to determine only whether sufficient evidence has been presented to make the issue of

fact a proper question for the jury; it does not weigh the evidence, judge the credibility of

witnesses, or determine the truth of the matter.  *Liberty Lobby*, 477 U.S. at 249; *Weaver v.*

*Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the

hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III.  Discussion

The Court first will address Plaintiffs' breach of contract claims and then it will address the remaining claims of breach of the covenant of good faith and fair dealing and antitrust violations.

### A.  Breach of Contract Claims

Plaintiffs claim that Wendy's committed breach of contract by prematurely terminating

the Franchise Agreements on July 20, 2007, and providing inadequate notice of termination

under the Franchise Agreements. According to Plaintiffs, Wendy's prematurely terminated the

Franchise Agreements because Plaintiffs were not provided the 30-day cure period as it relates to

instances of default. Wendy's argues that it had a right to terminate Burda's franchise rights

under the Franchise Agreements on July 20, 2007, for two independent reasons: Burda and his

businesses repeatedly failed to make both monthly royalty and WNAP payments under each of

his thirteen Franchise Agreements, and Burda and his businesses were completely insolvent.

Under Section 14.2 of each Franchise Agreement, Wendy's had the right to immediately

terminate all rights of the franchisee under the Franchise Agreement, that is, Wendy's could in

effect immediately terminate the agreement, if the franchisee committed a default and then

committed "the same default again within a six-month period of the previous default." (Doc. 62-

4). A franchisee's failure to promptly pay any monies owing to Wendy's, such as monthly

royalty or WNAP payments, constitutes an event of default under each Franchise Agreement.

Pursuant to the terms of the Franchise Agreements, if a franchisee fails to promptly pay any

monies owed, Wendy's may terminate the Franchise Agreements by providing written notice of

the default to the franchisee, at least 30 days prior to the effective date of the termination,

indicating the nature of the default. The franchisee may avoid the termination of his franchise

rights by curing the default within the 30-day period. If the default is not timely cured, then

Wendy's may terminate the franchisee's rights under the Franchise Agreement, effective

immediately upon the expiration of the 30-day period. Therefore, Wendy's was permitted to

immediately terminate the franchisee's rights if the franchisee committed the same default within

six months of the previous default, or if the franchisee failed to timely cure a default upon

9

receiving proper notice.

Burda's deposition testimony indicates that, in May 2006, Wendy's agreed to allow him to defer payments on monies that were already due, for a period of eight months (until January 2007). Additionally, Wendy's has provided evidence of Burda's default under each of the thirteen Franchise Agreements, as it relates to royalty and WNAP payments, for the months of December 2006, and January, February, March, and April 2007. Notices as to these defaults were sent in February, March, April, May, and June 2007. Burda does not dispute that he did not promptly pay the monies owed to Wendy's as asserted in the notices of default. He asserts in his brief in opposition to Defendants' Motion for Summary Judgment that Wendy's indicated that it would defer royalties and WNAP fees despite continuing to issue default notices. He suggests that Wendy's approved a blanket deferral of all monies owed by Burda under the Franchise Agreements. Burda also argues that Wendy's should not benefit from a situation it created by "forcing" him to accept FRED program restaurants, and that he was not provided the 30-day cure period.

Although Burda generally asserts that Wendy's granted a deferral of royalties and WNAP fees, he does not point to any evidence indicating that Wendy's agreed to defer any royalties or WNAP fees due, other than those deferred under the agreement reached in May 2006. In addition to the fact that his statements lack specificity regarding the deferral, Burda's unsworn statements contained in briefing do not constitute evidence and cannot create a genuine issue of material fact. The only evidence in the record on this issue indicates that Wendy's approved the deferral of delinquent royalty and WNAP payments for eight months beginning in May 2006. And Plaintiffs have not pointed to any evidence indicating that Wendy's approved a continuing

10

blanket deferral of all monies that were past due.  Therefore, the undisputed evidence in the

record demonstrates that Wendy's repeatedly sent notices to Burda in the first half of 2007

regarding his defaults under the agreements, and that Burda did not cure his defaults.

Plaintiffs argue that Wendy's improperly terminated the Franchise Agreements in July

2007 because the default notices that Burda received on June 27, 2007, indicated that he had 30

days to cure his defaults.  But this argument does not address the multiple other default notices

he received.  That Burda was not provided 30 days to cure the final default, did not negate

Wendy's independent right to terminate the Franchise Agreements due to Burda's failure to cure

pursuant to the previous default notices.  In other words, the final notices did not somehow

modify the terms of the Franchise Agreements.  Also, Burda's repeated defaults provided an

additional independent basis to immediately terminate the Franchise Agreements.  Therefore,

pursuant to the express terms of the Franchise Agreements, Wendy's had a right to terminate

Burda's franchisee rights under these agreements because Burda failed to timely cure his

defaults, and because he repeatedly committed the same defaults.

Moreover, Wendy's had the right to terminate each Franchise Agreement, without any

cure period, because Burda had "become insolvent" on or before July 20, 2007.  Each Franchise

Agreement provides that, if the franchisee "become[s] insolvent," the "Franchisee shall be

deemed to be in default and Franchisor may, at its option, terminate all rights of Franchisee

hereunder, without affording Franchisee any opportunity to cure the default, effective

immediately" after five days from when the notice is sent by Wendy's or upon receipt of notice

by the franchisee, whichever is earlier.  (Doc. 62, Ex. 2A, Section 14.2.I).  The Franchise

Agreements do not define "insolvent."  Black's Law Dictionary (9th ed. 2009) defines

"insolvent" as "([o]f a debtor) having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due."

In evaluating Burda's franchises, Taggart estimated that they held approximately $8 million in assets, but had approximately $11 million in secured liabilities. Taggart testified that, although Burda did not provide his personal financial statements as requested, he stated that he was insolvent. Additionally, there is evidence that, by at the latest mid-2007, Burda's businesses (1) were spending more cash than what was coming in (were operating on a negative cash flow basis), (2) were not paying Wendy's on time, (3) were not paying creditors on time, and (4) were not paying taxes on time. Therefore, evidence in the record clearly demonstrates that Burda and his businesses were insolvent prior to Wendy's decision to terminate Burda's franchisee rights.

While Burda has produced no evidence to dispute the evidence of his or his businesses' insolvency, Burda argues that Taggart's opinions are based on conjecture because he was not involved until 10 to 15 days prior to the termination of the Franchise Agreements, because he is not an expert in valuation, and because he had insufficient information to form his opinions. Burda's challenge to the admissibility of Taggart's statements is unavailing as Taggart testified to his experience in analyzing the financial condition of businesses in an effort to assist these businesses in restructuring. In fact, Burda retained Taggart in an effort to fix his financial problems. Evaluating the value of assets and comparing assets to liabilities necessarily would be part of such a process. Also, while Taggart testified that Burda was uncooperative in providing certain requested information (primarily relating to Burda's personal finances), Burda's general statement that Taggart lacked sufficient information to form an opinion is insufficient to create a genuine issue of material fact. Additionally, it is undisputed that Burda told Taggart that he was

insolvent.

Burda also attempts to refute the evidence of insolvency by asserting that he invested

$230,000 into the business during 2006, and was arranging for additional equity investments in

2007 to cure any cash shortfalls.  Burda further suggests that Wendy's acted improperly with

respect to the FRED program restaurants because it pressured him into opening these restaurants

in his market.  While Burda claims that he was arranging for additional capital for his franchises,

he does not challenge the insolvency status of his franchises on the date he was handed the

Notice of Termination.  Additionally, while Burda complains about Wendy's decision to open

FRED restaurants in his market, and the corresponding pressure this placed on him and his

franchises, he does not explain the unlawfulness of this decision.  In substance, Burda simply

challenges the business judgment of the decision.  To summarize, Burda does not point to any

evidence supporting his opposition; he simply relies on his own unsworn statements contained in

his briefing.

In the final analysis, Wendy's has presented evidence showing that it had the right under

the Franchise Agreements to terminate Burda's franchise rights on July 20, 2007.  Conversely,

Burda has presented no evidence creating a genuine issue of material fact as to this issue.

Accordingly, Plaintiffs' breach of contract claims fail.

**B.      Remaining Claims**

Defendants argue that they are entitled to judgment as a matter of law as to Plaintiffs'

claims of breach of the covenant of good faith and fair dealing and antitrust violations because

Plaintiffs released them from any and all claims Plaintiffs could have asserted against them as of

May 24, 2006.  Additionally, Defendants argue that these remaining claims are foreclosed by the

terms of the Franchise Agreements.  Plaintiffs argue that they did not release any and all claims

against Wendy's for breach of the covenant of good faith and fair dealing and for antitrust

violations because Burda does not possess any special knowledge regarding releases, there was

an absence of negotiation regarding the releases, public policy should prevent the enforcement of

the releases, and Plaintiffs were under duress at the time of signing the 2006 release.

In July 2004, the LLCs assigned to Burda their rights under the Franchise Agreements,

making Burda, individually, the sole franchisee under each of the thirteen Franchise Agreements.

In consideration for Wendy's agreement to permit this assignment of franchise rights, the LLCs

and Burda executed a "General Release of All Claims" against Wendy's and its subsidiaries.  In

December 2004, and in consideration for Burda's signing of the final Franchise Agreement,

Burda executed an additional "General Release of All Claims" against Wendy's and its

subsidiaries.  Finally, in consideration for the willingness of Wendy's to defer payment on over

$350,000 in past due obligations, Burda executed a final "General Release of All Claims" that,

like the other releases, provided that Burda and the LLCs released any and all claims against

Wendy's and its subsidiaries that could have been asserted at any time up to the date of the

release.  This release was signed on May 24, 2006, by Burda, in his individual capacity, and by

Burda on behalf of the LLCs.  By these documents, Burda and the LLCs released all claims that

could have been asserted against Wendy's and its subsidiaries up to the date of the release.

A release may be defined as "the giving up or abandoning of a claim or right to the

person against whom the right is to be enforced or exercised." *Fabrizio v. Hendricks*, 654

N.E.2d 127, 130 (Ohio Ct. App. 1995).  A release of a cause of action for damages is ordinarily

an absolute bar to any later action on any claim encompassed within the release.  *Haller v.*

*Borror Corp.*, 552 N.E.2d 207, 210 (Ohio 1990). A release is a contract that is favored by the

law to encourage the private resolution of disputes. *Lewis v. Mathes*, 829 N.E.2d 318, 322 (Ohio

Ct. App. 2005).

Plaintiffs argue that the general releases signed by Burda should not apply here for

various reasons. In particular, Plaintiffs contend that Defendants improperly attempt to impute

some special knowledge on Burda as it relates to the releases. In this regard, Plaintiffs assert that

Defendants erroneously argue that Burda was an experienced lawyer and therefore he had

special knowledge as it relates to any release. Burda notes that, from the time he graduated from

law school in 1980, until his relationship with Wendy's was terminated, in July 2007, he did not

practice as an attorney. Burda reasons that he did not have any special knowledge as it relates to

releases as suggested by Defendants. This argument misses the mark. Even though Burda may

not have been engaged in the practice of law prior to the termination of his franchise relationship

with Wendy's, he was licenced to practice law in Ohio, and, according to Ohio Supreme Court

records, had been since 1981. Whether Burda had "special knowledge" as to releases is

immaterial. Burda is presumed to have read the release, and he is bound by its terms. *See*

*Preferred Capital, Inc. v. Power Engineering Group, Inc.*, 860 N.E.2d 741, 745 (Ohio 2007)

("[P]arties to contracts are presumed to have read and understood them and . . . a signatory is

bound by a contract that he or she willingly signed."). And, as a licensed attorney, he

undoubtedly would have understood the legal significance of what he was signing.

Plaintiffs also argue that one or more of these releases should not bar his remaining

claims because there was an absence of negotiation between Plaintiffs and Defendants as it

relates to the releases, and they were signed under unfavorable conditions for Plaintiffs.

15

Plaintiffs assert that they were under economic duress to sign the releases because of certain

conduct of Wendy's. Specifically, Plaintiffs argue that Wendy's forced Plaintiffs to incur greater

costs by dealing with New Bakery, forced them to accept and operate FRED program

restaurants, and then eliminated food distribution options. Plaintiffs' unequal bargaining power

and duress arguments are not persuasive.

Absent a violation of public policy, fraud or duress, it is not necessary, and in fact

impermissible, to go beyond the four corners of an agreement when the intent of the parties can

be unambiguously discerned. *Nat. Union Fire Ins. Co. v. Shane and Shane Co.*, 605 N.E.2d

1325, 1328 (Ohio Ct. App. 1992). Moreover, when the parties have negotiated the release with

the assistance of legal counsel, and both sides have agreed to the language included in the

release, there is an assumption that the parties are fully aware of the terms and scope of their

agreement. *Task v. National City Bank*, No. 65617, 1994 WL 43883, at *4 (Ohio App. 8th Dist.

Feb. 10, 1994).

Plaintiffs suggest that a waiver of antitrust violations is contrary to public policy. This

assertion lacks merit, however, as the Sixth Circuit has specifically found that releases "of anti-

trust claims are treated the same as releases of other claims." *Schott Enterprises, Inc. v. Pepsico,

Inc.*, 520 F.2d 1298, 1300 (6th Cir. 1975). Therefore, there "is no public policy against the

release of any anti-trust claim." *Id.*

The Court also finds as unpersuasive Plaintiffs' argument that Burda's agreement to the

terms of the 2006 release was the result of economic duress. A person who claims to have been

a victim of economic duress must show that he was subjected to "a wrongful or unlawful act or

threat," and that it "deprive[d] the victim of his unfettered will." *Blodgett v. Blodgett*, 551

N.E.2d 1249, 1251 (Ohio 1990). "Merely taking advantage of another's financial difficulty is not duress." *Id.* Therefore, to prove economic duress as it relates to the 2006 release, Plaintiffs must show that they suffered financial distress due to wrongful or illegal conduct of Wendy's, and that there was no reasonable alternative to the terms presented by Wendy's for the release. *See id.* That is, Plaintiffs must show that Burda involuntarily signed the release as a result of wrongful or illegal conduct of Wendy's.

Burda asserts that he was pressured into acquiring additional FRED program stores, that he was forced to buy his sandwich buns from New Bakery, and that he had additional costs due to Wendy's food distribution program involving Willow Run. Burda reasons that this conduct by Wendy's was wrongful and/or illegal and resulted in Burda's involuntary decision to sign the release in 2006. Burda's arguments relating to allegedly wrongful or illegal conduct by Wendy's are unavailing because Burda, individually, and on behalf of the LLCs, signed general releases throughout his franchise relationship with Wendy's. Burda signed general releases in 1996, 2000, 2001, 2002, 2003, 2004, and 2006. Each time Burda signed a general release, he waived or abandoned his ability to assert, as a claim or otherwise, wrongful or illegal conduct by Wendy's, as of the date of the release. In view of the assertions made in the Amended Complaint, Burda's claims for breach of the covenant of good faith and fair dealing and for antitrust violations had accrued by December 17, 2004, the date Burda signed a general release and his final Franchise Agreement. Moreover, Burda cannot now argue that the 2006 release was the result of wrongful or illegal conduct by Wendy's when Burda had already released any and all claims he could have made relating to this conduct.

Because the Court finds that Plaintiffs' claims of breach of the covenant of good faith and

17

fair dealing and antitrust violations are barred by the express terms of the releases signed by Burda, it is unnecessary to address the additional arguments set forth by Defendants as to why these claims fail.

**IV.      Conclusion**

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment.  Therefore, all five of Plaintiffs' claims are **DISMISSED with prejudice**.  Defendants' breach of contract and unjust enrichment counterclaims remain pending.  Defendants shall file a notice with the Court, within seven days of the filing of this decision, as to whether they seek to prosecute these claims.  If these claims are withdrawn, final judgment will be entered and this case will be closed.

The Clerk shall remove Documents 61 and 62 from the Court's pending motions list.

**IT IS SO ORDERED.**

 *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**